UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------x
UNITED STATES OF AMERICA,

     - against -

ROBERT MELENDEZ,

                 Defendant.
----------------------------------------x

04 Cr. 424-03 (RWS)

SENTENCING OPINION

**Sweet, D.J.,**


        On February 17, 2005, Defendant Robert Melendez ("Melendez") appeared before the Honorable Debra C. Freeman of this district and allocuted to the conduct charged in the sole count of the indictment, conspiracy in violation of 21 U.S.C. § 846 to distribute and possess with intent to distribute one kilogram and more of heroin, in violation of 21 U.S.C. §§ 812, 841(a)(1) and 841(b)(1)(A). Melendez's plea was accepted on March 2, 2005. Melendez will be sentenced to 60 months imprisonment and five years supervised release. A special assessment fee of $100 is mandatory and is due immediately.


**Prior Proceedings**


        On May 6, 2004, the government filed a sealed indictment against Melendez and his co-defendants, charging them with a single count of violating 21 U.S.C. § 846, conspiracy to distribute and



possess with intent to distribute one kilogram and more of heroin. The indictment was unsealed on May 11, 2004, and an arrest warrant for Melendez was issued on the same day. Melendez was arrested on May 11, 2004, and he has remained in custody since that time. Melendez entered a guilty plea on February 17, 2004, which this Court accepted on March 2, 2005, and currently Melendez is scheduled for sentencing on June 13, 2005.

## The Sentencing Framework

In accordance with the Supreme Court's decision in <u>United States v. Booker</u>, 125 S. Ct. 738 (2005), and the Second Circuit's decision in <u>United States v. Crosby</u>, 397 F.3d 103 (2d Cir. 2005), the sentence to be imposed was reached through consideration of all of the factors identified in 18 U.S.C. § 3553(a), including the advisory Sentencing Guidelines (the "Guidelines") established by the United States Sentencing Commission. Thus, the sentence to be imposed here is the result of a consideration of:

  (1)   the nature and circumstances of the offense and the history and characteristics of the defendant;

  (2)   the need for the sentence imposed --

      (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

      (B)   to afford adequate deterrence to criminal conduct;

2

> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for --
>
> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines ...;
>
> (5) any pertinent policy statement ... [issued by the Sentencing Commission];
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). A sentencing judge is permitted to find all the facts appropriate for determining a sentence, whether that sentence is a so-called Guidelines sentence or not. See Crosby, 397 F.3d at 114-15.

**The Defendant**

The Court adopts the facts set forth in the Probation Department's Pre-sentence Report with respect to Melendez's family history and personal history.

## The Offense Conduct

The indictment filed in this action charges that from at least 1999 through May 2004, Melendez, along with his nineteen co-defendants and others, were members of a criminal organization in the Bronx that controlled a three-block strip of Daly Avenue between East 179th Street and Bronx Park South (the "Daly Avenue Organization" or the "Organization"). According to the indictment, the Organization sold heroin all day and late into the night during the period identified in the indictment, conducting tens of thousands of hand-to-hand heroin transactions. The Organization operated out of several buildings, including 2105 Daly Avenue and 2114 Daly Avenue.

Melendez was both a "runner" and a "pitcher" for the Organization. As a runner, Melendez would transport drugs to pitchers, taking from them the proceeds of their sales and turning those profits over to the Organization's leader, David Delarosa. Pitchers for the Organization would be provided heroin on consignment by managers in the Organization, and would then sell the heroin to customers, paying the managers for the heroin as they were able to sell it. Workers and pitchers also acted as "steerers," directing customers on Daly Avenue to other workers or to managers to complete sales of heroin. Melendez worked primarily as a runner but also conducted hand-to-hand sales during the course of his involvement with the conspiracy. Although he acted as the

4

middle-man between the managers and the pitchers, Melendez did not supervise or manage other members of the Organization.

Based on trial testimony before the Court, the Organization sold an average of twenty-five bundles of heroin a day, which amounts to approximately half of a kilogram per month, although the actual amount could vary from month to month.[1] With

---

[1] Although the government asserts that the Organization sold "as much as fifty bundles of heroin a day," which is the equivalent of 500 glassines of heroin a day, the Court finds an average daily distribution of twenty-five bundles. The trial testimony of one cooperating witness, who is a former member of the Organization, reveals that the sale of forty to fifty bundles was the "biggest number of bundles [the witness could] <u>ever</u> remember selling in one day." (Trial Trans. p. 137) (emphasis added). That same witness a few moments later then said, in response to further questioning by the government, that "the most bundles is like probably eighty to a hundred." (Tr. Trans. p. 137).

However, a different cooperating witness testified on direct examination that "on an average day" he would be able to sell "anywhere from a couple of bundles, like two bundles, three bundles, all the way up to thirty bundles." (Tr. Trans. p. 387). On a slow day he would sell "anywhere from five bundles or less," and on a "really busy day, anywhere like up to eighty bundles." (Tr. Trans. p. 388). But, he then testified that this latter number was not based on his own experience -- but rather gleaned "from talk because you just like hear the guys either complaining about how little drug money they made or they could be <u>boasting</u> about how much drugs they sold that day." (Tr. Trans. p. 388) (emphasis added).

The Organization operated in three shifts, with two people -- a manager and a pitcher -- working each shift. The pitcher conducted most of the sales, while the manager may have sold if the opportunity arose. (Tr. Trans. p. 135). The Court considered both the structure of the Organization and the testimony presented regarding sales when determining the average daily distribution of heroin to attribute to the conspiracy.

respect to Melendez specifically, the Court estimates that he should be held accountable for conspiring to distribute between 3 and 10 kilograms of heroin during his sixteen month involvement (from January 2003 through May 2004)[2] with the conspiracy.

Melendez was arrested on May 11, 2004.

## The Relevant Statutory Provisions

The statutory minimum term of imprisonment for the sole count of the indictment is ten years and the maximum term is life, pursuant to 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 846. The applicability of the statutory minimum sentence may be limited in certain cases pursuant to 18 U.S.C. §§ 3553(f)(1)-(5).

If a term of imprisonment is imposed, the Court subsequently shall impose a term of supervised release of at least five years pursuant to 21 U.S.C. § 841(b)(1)(A).

Melendez is not eligible for probation because the instant offense is one for which probation has been expressly precluded by statute, pursuant to 18 U.S.C. § 3561(a)(2) and 21 U.S.C. § 841(b)(1)(A).

---

[2] Melendez was first arrested in connection with the Daly Avenue Organization on January 4, 2003, revealing his involvement with the Organization spanned the period from January 2003 to May 11, 2004. (Government letter, dated June 9, 2005).

The statutory maximum fine is $4 million, pursuant to 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 846. A special assessment of $100 is required. See 18 U.S.C. § 3013.

Melendez may be declared ineligible for any or all Federal benefits for up to five years as determined by the Court pursuant to 21 U.S.C. § 862(a)(1)(A). Federal benefit is defined to mean "'any grant, contract, loan, professional license, or commercial license provided by an agency of the United States or by appropriated funds of the United States' but 'does not include any retirement, welfare, Social Security, health, disability, veterans benefit, public housing, or other similar benefit, or any other benefit for which payments or services are required for eligibility.'" See 21 U.S.C. § 862(d).

Pursuant to the Violent Crime Control and Law Enforcement Act of 1994, all offenders on probation, parole or supervised release for offenses committed after September 13, 1994, are required to submit to one drug test within fifteen days of commencement of probation, parole or supervised release and at least two drug tests thereafter for use of a controlled substance, unless ameliorated or suspended by the court due to its determination that the defendant poses a low risk of future substance abuse as provided in 18 U.S.C. §§ 3563(a)(5) and 3583(d).

**The Guidelines**

The November 1, 2004 edition of the United States Sentencing Commission, <u>Guidelines Manual</u> ("U.S.S.G.") has been used in this case for calculation purposes, in accordance with U.S.S.G. § 1B1.11(b)(1).

The guideline for a violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 846 is found in U.S.S.G. § 2D1.1(a)(2), which specifies that the base offense level is set in accordance with the Drug Quantity Table under U.S.S.G. § 2D1.1(c)(2). At his allocution, Melendez indicated that he knowingly conspired with others to possess, with intent to distribute, heroin. The Court finds that the amount for which Melendez should be held accountable is between 3 and 10 kilograms of heroin. In light of this latter amount, and pursuant to the Drug Quantity Table, the base offense level is 34.

Based on Melendez's plea allocution, he has accepted responsibility for the instant offense. Furthermore, since he offered timely notice of his intention to plead guilty, thus allowing the government to allocate its resources more efficiently, the offense level is reduced three levels, pursuant to U.S.S.G. §§ 3E1.1(a), (b).

**Disputed Adjustments**

Melendez argues he should be eligible for a two level reduction under the safety valve provision, which requires, among other conditions,: (1) that the defendant not be a leader, organizer, manager of supervisor of others in the offense; (2) that the defendant not possess a firearm in connection with the offense; and (3) that, by the time of sentencing, the defendant truthfully has provided the Government all information and evidence the defendant has concerning the offense or offenses. See U.S.S.G. §§ 5C1.2(a)(1)-(5).

## Role in the Offense

The government asserts that Melendez carried an enhanced role in the Organization and should receive a two level increase based on the additional responsibilities he shouldered as a runner. See U.S.S.G. § 3B1.1(c). Should the Court grant this upward adjustment for aggravated role, Melendez would not be eligible for the safety valve provision under U.S.S.G. § 5C1.2(a)(4). Melendez rejects the government's characterization of his duties as managerial or supervisory in nature, asserting that he carried no decision-making authority and exercised no power over any other member of the Organization.

"Factors the court should consider [when distinguishing a leadership and organizational role] include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the

9

claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1 n.4.

Trial testimony established Melendez's unique role in the Organization. Specifically, one cooperating witness stated that "[Melendez] was like a runner," and "right-hand man" to David Delarosa, the conspiracy's ringleader, (Tr. 141, 270), while another cooperating witness established that Melendez was "the one that was kind of like in charge of the drugs and once in a while you would see him like selling." (Tr. 381).

Furthermore, attempting to avail himself of the safety valve reduction, Melendez proffered for the government, disclosing that he was one of the people, but not the only person, who stored drugs for David Delarosa. Additionally, he admitted to sharing a "close personal relationship with the leader of the conspiracy" and to having "attached himself to David Delarosa."

While the record illustrates Melendez's function as distinct from the roles played by other pitchers in the Organization, the record does not reflect Melendez's heightened authority over other members of the Organization or any disproportionate benefit flowing to him for his particular role as runner. No evidence has been presented that he planned or

organized the shifts worked by the pitchers and managers; defined the nature or scope of the enterprise; or, recruited other members into the conspiracy. Although one witness's trial testimony characterizes Melendez as David Delarosa's "right-hand man," Melendez argues that he was merely a lackey for David Delarosa, acting as a gofer for David Delarosa and completely at the mercy of the ringleader's orders. Despite the government's assertions, a "close personal relationship" does not translate automatically into a close business relationship in which David Delarosa endowed Melendez with any sort of authority, discretion, or autonomy.

In addition to the record's lack of evidence as to Melendez's decision-making authority within the Organization, a psychiatric evaluation conducted by Dr. Beverly Martin (hereinafter the "Martin Report") of Melendez submitted to the Court informs that the defendant suffers from mild mental retardation and an I.Q. of approximately 59. (Martin Report, p.5). The report further characterizes Melendez as suffering from, among other things, Personality Disorder, exhibiting a "strong dependency on others to guide him and reassure him. When faced with a challenging situation [Melendez] tends to relinquish control to others instead of boldly confronting the issue himself." (Martin Report, p.6). The report concludes,

> This type of worldview permeates [Melendez's] thinking and reflects how he passively perceives and interacts with the world. He tends to engage in a type of magical thinking whereby things work out by themselves with

> little thought or effort. Based on these responses,
> [Melendez] may be relating to his environment on a very
> immature and simplistic level. He seems to become easily
> confused with the demands of life and there is a
> passivity with regards to his interactions with others.

(Martin Report, p.7)

According to this report, Melendez lacked the capacity to assume a leadership role in the Organization or to exercise any type of decision-making authority over his fellow members. This psychological profile confirms that Melendez is a follower by nature and does not seek to control or confront others. To the contrary, he seeks to follow and to please -- to be someone's "right-hand man." Demonstrating limited cognitive function, Melendez is mildly mentally retarded and becomes "easily confused" with the mundane demands of everyday life; he could not maintain employment as a cashier at a local McDonald's because he could not comprehend and execute his responsibilities.

Given the foregoing discussion, the Court finds that Melendez did not carry decision-making authority or exercise a managerial or supervisory position within the Organization. He did not occupy an aggravated role in the conspiracy, and no two level enhancement will be granted under U.S.S.G. § 3B1.1(c).

## Use of a Firearm

The government argues that Melendez should receive a two level increase for possession of a firearm pursuant to U.S.S.G. § 2D1.1(b)(1). The application of this two level enhancement would

preclude Melendez from benefiting from the safety valve reduction under U.S.S.G § 5C1.2(a)(2).

The commentary to section 2D1.1(b)(1) states that two levels should be added for possession of a firearm "unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1 comment. n.3. The Second Circuit elaborates in United States v. Smith, 215 F.3d 237 (2d Cir. 200), stating "our case law indicates that once the government has established that a weapon's presence was reasonably foreseeable to the defendant during conduct (i.e., the storage and cutting of drugs) relevant to the offense (i.e., distribution of drugs) at issue, the enhancement will apply, unless the defendant demonstrates that it is clearly improbable that the weapon was connected with the drug offense." Id. at 241.

Trial testimony of one cooperating witness, Mr. Emerson Peters (hereinafter "Peters"), linked Melendez to possession of a firearm on only one evening. According to Peters, as he and Melendez were walking back to his apartment, other men standing on a street corner opened gunfire on Melendez and himself. Peters testified that he and Melendez returned fire in self-defense, luckily escaping unscathed.[3]

---

[3] It is important to note that Peters testified at the trial of two of Melendez's co-defendants. As such, Melendez did not have the opportunity to cross-examine or confront this witness's testimony. Although hearsay is admissible at sentencing, and, as such, no issue arises under Crawford v. Washington, 124 S.Ct. 1354 (2004), the Court notes that Peters's testimony with respect to Melendez's possession of

Pursuant to the Second Circuit test articulated in <u>Smith</u>, Melendez must counter the government's allegations of firearm possession by demonstrating that it was "clearly improbable that the weapon was connected with the drug offense." <u>Id</u>. While Melendez confirms that he and Peters went to Peters's apartment, Melendez asserts that only Peters was carrying drugs. These drugs were for his personal use, and not the Organization's property to be sold, thereby demonstrating that the two of them were not engaged in activity in furtherance of the conspiracy at the time of this incident.

As the two men approached Peters's apartment, Peters, a member of the "Bloods" gang, "had words" with several men on the street corner who were from the Peters's rival gang, the "Crips." Melendez and Peters went to Peter's apartment, and upon leaving a short while later, they noticed a large group of "Crips" waiting for them. A shoot-out ensued, with the "Crips" men first firing on Melendez and Peters. Peters, who possessed two guns, passed one to Melendez to use in self-defense. Once both men escaped unharmed, Melendez returned the firearm to Peters.[4]

The government does not object to the narration provided by Melendez, but instead argues that a shoot-out between two rival gangs during which Melendez possessed a firearm is sufficient to

_____

a firearm was not tested in the "crucible of cross-examination."

[4] The Court notes that Melendez's version of events was submitted via defense counsel and not under oath.

apply the firearm enhancement because Melendez was seeking to protect Peters, a co-conspirator in the Organization.

However, the Second Circuit in _Smith_ requires a connection between the drug offense and the possession of a firearm. Melendez possessed the gun for only a few moments, and held it in self-defense, while being fired upon by men whom he did not know. He was not in the process of conducting business on behalf of the Organization. He simply was walking down the street when his companion, and in this case co-conspirator, chose to engage in hostilities with rival gang members. Melendez had no stake in Peters's confrontation with the "Crips" and did not participate in the build-up to the shoot-out. Melendez temporarily possessed the firearm after finding himself in the cross-fire between rival gang members, and, as such, did not possess the firearm to further goals of the conspiracy. No two level enhancement for possession of a firearm will apply under U.S.S.G. § 2D1.1(b)(1).

_Truthful Proffer_

Without enhancements for aggravated role and possession of a firearm, Melendez is eligible for a safety valve reduction provided he proffered truthfully to the government prior to the time of sentencing. _See_ U.S.S.G. § 5C1.2(a)(5).

Melendez has proffered with the government before the

15

time of sentence, and the government has not stated that Melendez proffered untruthfully. Describing Melendez's attitude as "cocky and manipulative," the government has not characterized his proffer session as untruthful. (Government letter, dated June 9, 2005, p.4). As noted in section 5C1.2(a)(5), "the fact that the defendant has no relevant or useful other information to provide or that the government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement." U.S.S.G. § 5C1.2(a)(5). Thus, based on the record before the Court, Melendez's proffer is accepted, and a two point safety valve reduction will be applied pursuant to U.S.S.G. §§ 5C1.2(a)(1)-(5).

**Remaining Calculations**

The adjusted offense level resulting from the foregoing calculations and discussion is 29.

Based on the offense level of 29 and a Criminal History Category of I, the guideline range for imprisonment is 87 to 108 months.

The authorized term for supervised release under the guidelines is five years, pursuant to U.S.S.G. § 5D1.2(b).

Melendez is not eligible for probation because the

applicable guideline range is in Zone D of the Sentencing Table, pursuant to U.S.S.G. § 5B1.1(b)(2), comment. n.2.

The fine range for the instant offense under the guidelines is from $17,500 to $4 million, pursuant to U.S.S.G. §§ 5E1.2(c)(3)(A) and 5E1.2(c)(4).

Subject to Melendez's ability to pay, the expected costs to the government of any imprisonment, probation, or supervised release shall be considered in imposing a fine, pursuant to U.S.S.G. § 5E1.2(d)(7). The most recent advisory from the Administrative Office of the United States Courts suggests a monthly cost of $1,931.97 to be used for imprisonment, a monthly cost of $292.21 for supervision, and a monthly cost of $1,590.66 for community confinement.

A special assessment of $100 is mandatory, pursuant to 18 U.S.C. § 3013.

Pursuant to U.S.S.G. § 5F1.6, eligibility for certain federal benefits may be denied to any defendant convicted of distribution or possession of a controlled substance.

**The Remaining Factors of 18 U.S.C. § 3553(a)**

Having engaged in the Guideline analysis, this Court also gives due consideration to the remaining factors identified in 18 U.S.C. § 3553(a) in order to impose a sentence "sufficient, but not greater than necessary" as is required in accordance with the Supreme Court's decision in <u>United States v. Booker</u>, 125 S.Ct. 738 (2005) and the Second Circuit's decision in <u>United States v. Crosby</u>, 397 F.3d 103 (2nd Cir. 2005). In particular, section 3553(a)(1) asks that the sentence imposed consider both "the nature and circumstances of the offense and the history and characteristics of the defendant," while section 3553(a)(2)(A) demands that the penalty "provide just punishment for the offense" that simultaneously "afford[s] adequate deterrence to criminal conduct" as required by § 3553(a)(2)(B).

Melendez was the youngest of three children and was raised exclusively by his mother after the age of four, when his father abandoned the family. Melendez had minimal contact with his father in the following years.

He has suffered from mild mental retardation for his entire life. He also was diagnosed with a learning disability in third grade and assigned to special education classes, in which he struggled every year. Growing up under strained economic conditions, his family did not have the resources to provide additional care for Melendez's learning disability. Though he persisted into high school, he dropped out before graduating.

18

His mother suffered from both physical and mental health problems during Melendez's upbringing, and though mother and son still share a close relationship, he reports his early life as difficult. He began smoking marijuana at age fourteen, and soon was addicted to marijuana, ecstasy and alcohol, using them in combination on a regular basis.

Since childhood Melendez has suffered from depression and anxiety disorders, for which he is now receiving mental health treatment and medication while incarcerated. He simultaneously has been diagnosed with Attention Deficit-Hyperactivity Disorder, for which he is also now medicated. A psychological evaluation filed with the Court describes Melendez as having "a strong dependency on others to guide him and reassure him," characterizing these as "dependent features" and the backbone of his personality disorder. (Martin Report, p.6).

Melendez's limited education and cognitive abilities coupled with his drug addiction and mental health problems prevented him from maintaining employment for any significant length of time. Although he did get hired as a cashier at a McDonald's, he was fired shortly after starting because he could not grasp the duties and responsibilities of the job. Seeking both approval from his peers and a means of supporting his drug habit, Melendez joined the Daly Avenue Organization.

Melendez has no prior convictions and has never spent any period of time incarcerated. Given that this sentence is Melendez's first, imposing any substantially lengthy sentence on this twenty year old man achieves both the "just punishment" and "adequate deterrence" sought under 18 U.S.C. §§ 3553(a)(2)(A),(B).

Furthermore, section 3553(a)(2)(D) requires the Court to consider a sentence that will "provide the defendant with needed educational or vocational training, medical care or other corrective treatment in the most effective manner." U.S.S.G. § 3553(a)(2)(D). Melendez's life-long mental health and educational challenges have never been addressed adequately or comprehensively. The Court must weigh Melendez's special need for extended mental health treatment, remedial education, and vocational training when imposing sentence. Given the foregoing discussion, a shorter term of incarceration combined with a lengthy period of supervised release carrying the aforementioned conditions best serves the long-term goals of punishment.

Finally, in considering the remaining sentencing factors under 18 U.S.C. § 3553(a), the Court must take into account "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. 18 U.S.C. § 3553(a)(6). Since <u>Booker</u>, a growing number of courts have "held that sentencing judges are `no longer prohibited from considering the disparity between co-

defendants in fashioning a reasonable sentence.'" _Ferrara v._
_United States_, -- F.3d --, 2005 WL 1205758, at *11 (D. Mass. May
13, 2005) (quoting _United States v. Hensley_, No. 2:04 CR 10081,
2005 WL 705241, at *2 (W.D. Va. Mar. 29, 2005)); _see also_ _United_
_States v. McGee_, -- F.3d --, 2005 WL 1324815, at *17 (7th Cir.
June 3, 2005); _Simon v. U.S._, 361 F. Supp. 2d 35, 49 (E.D.N.Y.
2005).[5]    The majority of Melendez's co-defendants are
pitchers or workers within the Organization, many of whom have
minimal criminal histories.  Although Melendez acted as both a
runner and as a pitcher, Melendez, like his co-defendants, did

---

[5] It should be noted that in an unpublished summary order
that was entered after _Booker_ and _Crosby_ were announced, the
Second Circuit reaffirmed the construction of section
3553(a)(6) announced in _United States v. Joyner_, 924 F.2d 454,
460 (2d Cir. 1991) (stating that "[t]o reduce the sentence by
a departure because the judge believes that the applicable
range punishes the defendant too severely compared to a co-
defendant creates a new and entirely unwarranted disparity
between the defendant's sentence and that of all similarly
situated defendants throughout the country").  _See_ _United_
_States v. Toohey_, 2005 WL 1220361, at *2 (2d Cir. May 23,
2005).  The _Toohey_ court stated:

> [Even after _Booker_,] _Joyner_'s construction of the
> role the Guidelines play in [the] § 3553(a)(6)
> consideration remains the same.  _See_ _United_
> _States v. Booker_, 125 S.Ct. at 761, 767
> (emphasizing the continued importance of the
> Guidelines to avoiding unwarranted sentencing
> disparities).  Thus, a sentencing court does not
> reasonably satisfy its statutory obligation under
> § 3553(a)(6) when it only compares discrete cases
> or defendants. Rather, to identify a reasonable
> sentence, § 3553(a)(6) expects a court to
> consider whether a defendant is favored or
> disfavored by a particular sentence "compared to
> all those similarly situated defendants." _United_
> _States v. Joyner_, 924 F.2d at 461.

_Id._

not carry any decision-making authority or any supervisory authority over other members. As such, Melendez is similarly situated to these co-defendants in his offense conduct. These co-defendants have benefitted from the "safety valve" provision and, similar to Melendez, are not subject to the statutory minimum mandatory 120 months incarceration. All of Melendez's co-defendants have suffered terrible upbringings, receiving little stability and support during their childhoods, and developing addictions to controlled substances at an early age.

Melendez's similarly situated co-defendants were involved in the conspiracy for a comparable length of time as Melendez, and, like Melendez, are held accountable for distributing 3 to 10 kilograms of heroin over the duration of their involvement. These co-defendants are sentenced to 60 months incarceration followed by five years of supervised release. The Court takes note of these sentences imposed on Melendez's similarly situated co-defendants in an effort to be aware of the "just punishment" afforded other co-defendants and thereby "avoid unwarranted sentence disparities" in accordance with 18 U.S.C. § 3553(a)(6).

**The Sentence**

For the instant offense, Melendez is sentenced to 60 months imprisonment and five years supervised release. As Melendez

22

has been detained without bail since his arrest, he is not a candidate for voluntary surrender pursuant to 18 U.S.C. § 3143(a)(2).

A special assessment fee of $100 payable to the United States is mandatory and due immediately. Because Melendez lacks financial resources and in consideration of the factors listed in 18 U.S.C. § 3572, no fine is imposed.

As mandatory conditions of supervised release, Melendez shall (1) abide by the standard conditions of supervision (1-13); (2) not commit another federal, state, or local crime; (3) not illegally possess a controlled substance; and (4) not possess a firearm or destructive device.

The mandatory drug testing condition is suspended due to imposition of a special condition requiring drug treatment and testing.

Melendez shall participate in a program approved by the United States Probation Office, which program may include testing to determine whether he has reverted to using drugs or alcohol. The release of available drug testing evaluations and reports to the substance abuse treatment provider, as approved by the Probation Officer, is hereby authorized. Melendez is required to contribute to the costs of services rendered (co-payment), in an

amount determined by the Probation Officer, based on ability to pay or availability of third-party payment.

Melendez shall participate in a mental health program approved by the United States Probation Office. Melendez shall continue to take any prescribed medications unless otherwise instructed by the health care provider. The defendant shall contribute to the costs of services rendered not covered by third-party payment, if he has the ability to pay. The Court authorizes the release of available psychological and psychiatric evaluations and reports to the health care provider.

Melendez shall report to the nearest Probation Office within 72 hours of release from custody and shall be supervised by the district of residence.

This sentence is subject to modification at the sentencing hearing now set for June 13, 2005.

It is so ordered.

New York, NY

June /3 , 2005

ROBERT W. SWEET
U.S.D.J.